UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| PETER CABRERA, | Case No. 18-cv-00721-LB |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| NANCY A. BERRYHILL, | |
| Defendant. | Re: ECF Nos. 18, 19 |

## INTRODUCTION

The plaintiff Peter Cabrera seeks judicial review of a final decision by the Commissioner of

the Social Security Administration denying his claim for disability benefits under Title II and Title

XVI of the Social Security Act.[1] He moved for summary judgment.[2] The Commissioner opposed

the motion and filed a cross-motion for summary judgment.[3] Under Civil Local Rule 16-5, the

matter is submitted for decision without oral argument. All parties consented to magistrate-judge

---

[1] Compl. – ECF No. 1 at 1–2. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Mot. – ECF No. 18.

[3] Cross-Mot. – ECF No. 19.

jurisdiction.[4] The court grants the plaintiff's motion, denies the Commissioner's motion, and remands for further proceedings.

## STATEMENT

### 1. Procedural History

The plaintiff was born on June 9, 1959. On February 2, 2018, he filed claims for social-security disability insurance ("SSDI") under Title II of the Social Security Act and supplemental-security income ("SSI") under Title XVI.[5] He alleged anxiety, depression, and shortness of breath with an onset date of June 1, 2009.[6] The Social Security Administration denied the application initially and on reconsideration.[7] On October 6, 2014, the plaintiff requested a hearing.[8] On March 21, 2016, Administrative Law Judge David R. Mazzi (the "ALJ") held a hearing in Oakland, California, and on October 25, 2016 he issued an unfavorable decision.[9]

The plaintiff appealed to the Appeals Council on November 23, 2016.[10] The Appeals Council denied his request on January 10, 2018.[11] On February 1, 2018, the plaintiff filed this action for judicial review and subsequently moved for summary judgment on August 3, 2018.[12] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[13]

---

[4] Consent Forms – ECF Nos. 8, 9.

[5] AR 17, 178, 180.

[6] AR 17, 54.

[7] AR 69, 88, 103.

[8] AR 17, 136.

[9] AR 14–30, 31–51.

[10] AR 174–75.

[11] AR 1, 2.

[12] Compl. – ECF No.1; Mot. – ECF No. 18.

[13] Cross-Mot. – ECF No. 19.

## 2. Summary of Record and Administrative Findings

### 2.1 Medical Records

#### 2.1.1 LifeLong West Berkeley Family Practice — Treating

In April 2014, nurse practitioner ("NP") Erica Diamant saw the plaintiff for a mental-health referral for depression.[14] The plaintiff was depressed because he had been unemployed for three years.[15] He did not take any medication and had not seen a provider in over eight years.[16] The plaintiff's overall appearance was normal, and he had appropriate mood and affect.[17] NP Diamant referred the plaintiff to a psychiatrist for his depression.[18]

In January 2015, NP Lewis Simpler saw the plaintiff for a preventive exam.[19] The plaintiff reported that he saw a psychiatrist through a homeless-action network who did not suggest medication.[20] The plaintiff reported that on average, he rode his bicycle for 30 minutes a day.[21] He smoked five to ten cigarettes a day but was considering quitting.[22] He had stable housing.[23] His physical examination was normal, and he was oriented to time, place, person, and situation.[24] He had appropriate mood and affect.[25] NP Simpler advised that the plaintiff should follow up with psychiatry through the homeless-action network.[26]

---

[14] AR 287.

[15] *Id.*

[16] *Id.*

[17] AR 288.

[18] *Id.*

[19] AR 386.

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] AR 387.

[25] *Id.*

[26] *Id.*

### 2.1.2     Elizabeth Walser, Psy.D. and Lesleigh Franklin, Ph.D. — Examining

On April 11, 2014, Elizabeth Walser, Psy.D., a psychologist, performed a psychological evaluation of the plaintiff to determine his cognitive and emotional functioning.[27] The plaintiff arrived on time for his appointment and was "adequately groomed" wearing "clean jeans and a button-down shirt."[28] Dr. Franklin was Dr. Walser's supervisor and gave the ultimate opinion on the plaintiff's functional abilities.

The plaintiff was homeless and "complained of agitation, irritability, fatigue, and poor concentration."[29] Dr. Walser noted that the plaintiff had difficulty learning when he was younger, but graduated high school.[30] He went to community college but left school to go to work.[31] The plaintiff was divorced and had two children.[32] He had a girlfriend at the time of the evaluation.[33] He drank in moderation.[34] He "started using methamphetamines in his 30's, and he used 2-3 times a month."[35] He used on and off for 20 years, but had not used since 2013.[36] The plaintiff "had been to jail approximately 10 times as an adult."[37]

The plaintiff reported that there was "no known family history of mental illness."[38] He "struggled with some anxiety and depressive symptoms, but he [was] suspicious of doctors and

---

[27] AR 277.

[28] AR 280.

[29] AR 277.

[30] AR 278.

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] AR 279.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

therapists, and he [would] not go.[39] The plaintiff rated the stress level in his life "as extreme because he [did] not know where he [would] live next."[40]

Dr. Walsner observed that the plaintiff was oriented to person, place, and purpose but had some trouble with time.[41] He could concentrate for the purpose of evaluation, but had moderate trouble on formal measures on attention.[42] His attitude was "a mixture of pleasant and irritable."[43] He had reservations about telling private information to Dr. Walsner but was "generally cooperative."[44] His thoughts were logical and coherent, and he exhibited "significant suspiciousness of others, and was more paranoid than is common, but he was not delusional."[45]

Dr. Walsner performed several tests. The plaintiff's scores on the WASI-2 (which measures cognitive functioning in verbal and perceptual reasoning) placed him in the 34th percentile.[46] Dr. Walsner noted that the plaintiff's anxiety influenced his performance and that his "overall IQ score was in the average range."[47]

The plaintiff scored in the fourth percentile on the RBANS test (which measures cognitive function in the areas of memory, attention, visuospatial abilities, and language functioning), which was "far below average range," but Dr. Walsner said that this result should be interpreted with caution because there was "statistically significant variability between index scores."[48]

The plaintiff's score on the MMSE (which screens for cognitive impairment) indicated "mild intellectual impairment."[49] On the Trail Making Test (which measures the executive-functioning

---

[39] Id.

[40] AR 280.

[41] Id.

[42] Id.

[43] Id.

[44] Id.

[45] Id.

[46] AR 281.

[47] Id.

[48] AR 281–82.

[49] AR 282.

skills of planning, previewing execution, and monitoring), the plaintiff's score indicated that he "may have mild trouble with simple executive functioning tasks, and [] may have significant trouble with more complex tasks."[50] The plaintiff scored a 29 on the BDI-II (which measures emotional functioning and underlying personality issues).[51] "Scores of 28 and above are associated with severe depression."[52]

Dr. Walser diagnosed the plaintiff with the following DSM-5 diagnoses: Major Depressive Disorder, Severe; Amphetamine Use Disorder, Mild, In Early Remission; Paranoid Personality Features; Homelessness; Insufficient Income; and Problems Related to Occupational Status.[53]

Dr. Franklin opined about the plaintiff's functional abilities (based on Dr. Walser's examination) as follows:

> [The plaintiff] has lived successfully by himself in the past, but he has not been able to organize himself recently to find a stable residence. He cannot get along well enough with others to live in a shelter or other group situation[]. [He] has held down a number of jobs, but he loses them due to problems with authority. If [he] were to be placed in a work situation now, he would likely have mild difficulties remembering and carrying out simple directions, and marked difficulties remembering and carrying out complex directions. He would have moderate difficulties with tasks requiring attention, and moderate difficulties completing tasks correctly at an adequate pace. He would have moderate trouble interacting with the public and coworkers and he would have marked trouble with authority figures because he loses his temper quickly and unexpectedly. He would have marked difficulty responding to changes in his normal work routine because he is a rigid thinker who can be suspicious [of] the motives of others. He would have marked difficulties completing a normal workday without intrusive psychological symptoms such as irritability and aggression, and moderate problems getting to work on time. If [he] was awarded Supplemental Security Income, he would not need a payee. Although he has used amphetamines in the past, he has not used this year, and he appears to be committed to avoiding drug use.[54]

---

[50] *Id.*

[51] AR 283.

[52] *Id.*

[53] AR 284.

[54] AR 284–85, 386–89.

### 2.1.3    LifeLong Trust Health Center — Treating

On several occasions from December 2015 through May 2016, the plaintiff saw Kari Jennings-Parriott, a licensed clinical social worker, at LifeLong Trust Health Center.[55]

In December 2015, the plaintiff had a flat affect and anhedonia, was feeling down, had difficulty sleeping and low energy, and was overeating, irritable, and "guarded."[56] He "had many questions about how seeing a LCSW could be useful."[57] He was well-groomed, a "good historian," and cooperative.[58] He had been unemployed for five to six years.[59] He denied any past psychiatric symptoms or diagnosis.[60] His mood was depressed.[61] Ms. Jennings-Parriott diagnosed him with "Depression" and "Major depressive disorder, recurrent episode, moderate," noting that the plaintiff was "guarded with her" and "need[ed] some rapport building."[62] Her treatment plan was to "work on supporting talk therapy with [the] patient weekly."[63]

On January 4, 2016, the plaintiff appeared guarded, withdrawn, and depressed.[64] He expressed some paranoid thoughts about the internet and people "getting his information."[65] He was concerned about how therapy could benefit him.[66] He had constant pain due to dental issues.[67] The plaintiff felt "isolate[d] from peers and stayed at home most days."[68] He "expressed anhedonia,

---

[55] *See* AR 340–85, 390–91, 404–13.

[56] AR 349.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] AR 350.

[62] AR 351.

[63] *Id.*

[64] AR 362.

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

poor concentration, lack of motivation, sadness, fatigue and worthlessness."[69] The plaintiff was depressed, and had an "impaired ability to make reasonable decisions.[70] He denied having hallucinations.[71] Ms. Jennings-Parriott's diagnosis remained unchanged, and the plaintiff discussed strategies to manage depression utilizing cognitive-behavioral therapy.[72] Ms. Jennings-Parriott noted that she would send a message to his primary care physician to discuss medication on how to assist with his anxiety during dental appointments.[73]

On January 15, 2016, the plaintiff was depressed and had trouble concentrating.[74] He had a flat affect, minimal insight, and an impaired ability to make reasonable decisions.[75] Ms. Jennings-Parriott's treatment plan was to meet with the plaintiff bi-monthly and discuss how to manage his depression and anxiety through cognitive-behavioral therapy.[76]

### 2.1.4    Matthew Fentress, M.D. — Treating

Dr. Fentress treated the plaintiff on multiple occasions between December 2015 and May 2016.[77] On December 3, 2015, Dr. Fentress saw the plaintiff for respiratory problems.[78] The plaintiff reported that he got tired easily, felt pressure in his chest, and experienced shortness of breath, especially while running, riding his bike, and carrying heavy things.[79] Dr. Fentress reviewed the plaintiff's medical and family history, examined the plaintiff, and ordered a chest X-

---

[69] *Id.*

[70] AR 362–63.

[71] AR 362.

[72] AR 363.

[73] *Id.*

[74] AR 371.

[75] AR 372.

[76] *Id.*

[77] *See, e.g.*, AR 340–45, 365–69, 375–78, 406–10.

[78] AR 340.

[79] *Id.*

ray.[80] The plaintiff's respiratory exam was normal.[81] Dr. Fentress's assessment included chest pain, dyspnea on exertion, essential hypertension, nicotine dependence, major depressive disorder (single episode, unspecified), and hyperlipidemia.[82]

On December 9, 2015, Dr. Fentress saw the plaintiff for a follow-up appointment.[83] The plaintiff reported that two days earlier, his legs were numb and tingling for about five minutes after walking a few blocks.[84] He was able to walk after that and felt tingling (but not pain).[85] Dr. Fentress examined the plaintiff and found the following problems: benign essential hypertension, hyperlipidemia, and chest pain on exertion.[86] Dr. Fentress increased the plaintiff's Amlodipine prescription for hypertension.[87]

On December 21, 2015, Dr. Fentress saw the plaintiff for a lab follow-up.[88] The plaintiff reported "ongoing bilateral leg numbness and tingling with mild discomfort" when walking more than two blocks.[89] The plaintiff resolved it with rest.[90] Dr. Fentress diagnosed the plaintiff with paresthesia of both legs and referred him to vascular to consider exercise testing.[91]

---

[80] AR 341–42.

[81] AR 342.

[82] AR 343. Dyspnea refers to the sensation of difficult or uncomfortable breathing. *Neal v. Colvin*, No. 1:14-cv-01503-SKO, 2015 WL 5232328, at *1 n.3 (E.D. Cal. Sept. 8, 2015) (citing *Dorland's Illustrated Medical Dictionary* 589, 1359 (31st ed. 2007)). Hyperlipidemia is a condition of elevated levels of lipids in the blood plasma. *Tavares v. Astrue*, No. C 06-6583-PJH, 2007 WL 4570188, at *3 n.3 (N.D. Cal. Dec. 21, 2007) (citing Stedman's Medical Dictionary at 922 (28th ed. 2007)).

[83] AR 352.

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] AR 354, 355.

[88] AR 357.

[89] *Id.*

[90] *Id.*

[91] AR 359. Paresthesia is an abnormal sensation in the body, as of burning, tickling, or tingling. *Ouellette v. Apfel*, No. C-99-2094 PJH, 2000 WL 1262642, at *2 n.6 (N.D. Cal. Aug. 24, 2000).

On January 7, 2016, Dr. Fentress saw the plaintiff for X-ray results.[92] The plaintiff reported that he had no recent chest pain, but he still had paresthesia in his legs while walking.[93] He felt the same sensation in his right leg when he stood for more than five minutes.[94] His respiratory exam was normal.[95] Dr. Fentress diagnosed the plaintiff with situational anxiety (because he was anxious about dentist appointments) and offered low-dose Ativan to take before dental appointments.[96]

On January 28, 2016, Dr. Fentress saw the plaintiff for chest and leg pain and occasional shortness of breath.[97] Dr. Fentress assessed hypertension, hyperlipidemia, Type 2 Diabetes, paresthesia of both lower extremities, and chest pain on exertion.[98]

On March 17, 2016, Dr. Fentress completed a mental-impairment questionnaire and reported the following clinical findings about the plaintiff's mental impairments: difficulty concentrating, disorganization, anhedonia, poor sleep, anxiety, and depression.[99] He reported a current GAF of 40.[100] The plaintiff had a flat affect and diminished insight and judgment."[101] As a result of his

---

[92] AR 365.

[93] *Id.*

[94] *Id.*

[95] AR 366.

[96] AR 367.

[97] AR 375.

[98] AR 376–77.

[99] AR 380–81.

[100] AR 380. A Global Assessment of Functioning ("GAF") score purports to rate a subject's mental state and symptoms; the higher the rating, the better the subject's coping and functioning skills. "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Worsham v. Colvin*, No. 15CV55-WQH-MDD, 2016 WL 750108, at *3 n.1 (S.D. Cal. Jan. 12, 2016) (citation and internal quotations omitted). "A GAF of 31–40 indicates '[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school.'" *Tagger v. Astrue*, 536 F. Supp. 2d 1170, 1173 n.3 (C.D. Cal. 2008) (citing American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. (Text Revision) 2000)) (internal quotations omitted).

[101] AR 380.

mental impairment, the plaintiff had marked difficulties in maintaining social functioning and maintaining concentration, persistence, and pace.[102]

He had a medically documented history of a chronic mental, schizophrenic, or affective disorder that lasted for at least two years and caused "more than a minimal limitation of ability to do any basic work activity" with the following: "[a] residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate."[103] Dr. Fentress anticipated that the plaintiff would be absent from work about two days per month due to his impairments and that his impairments "lasted or can . . . be expected to last at least 12 months."[104]

Dr. Fentress found that the plaintiff was not a malingerer.[105] Alcohol or substance abuse did not contribute to any of the plaintiff's impairments.[106] His impairment lasted, or could be expected to last, at least 12 months.[107] "[T]he earlies date that [Dr. Fentress's] description of symptoms and limitations applied" was January 2011.[108]

On March 17, 2016, Dr. Fentress also completed a questionnaire documenting his medical opinion about the plaintiff's physical ability to do work-related activities.[109] The plaintiff could lift and carry 20 pounds on an occasional basis, and 10 pounds on a frequent basis.[110] The plaintiff could stand and walk (with normal breaks) for fewer than two hours during an eight-hour workday and had no limit in sitting.[111] The plaintiff's impairments would interfere with his concentration or

---

[102] Id.

[103] AR 381.

[104] Id.

[105] Id.

[106] Id.

[107] Id.

[108] Id.

[109] AR 382–85.

[110] AR 382.

[111] Id.

pace of work for about 10% of the workday.[112] The plaintiff's impairments would "never" cause him to be absent from work and would interfere with the plaintiff's concentration or pace of work 10% of the workday.[113]

### 2.1.5  Disability Determination Explanations — Non-Examining

During the administrative process, non-examining doctors conducted two disability-determination explanations ("DDEs"), one related to the plaintiff's initial claim for disability and a second related to his claim at the reconsideration level.[114] In both, the non-examining physicians found that the plaintiff was not disabled.[115]

As part of the first DDE, Dara Goosby, Psy.D., reviewed the plaintiff's records.[116] Her primary diagnosis was "Affective Disorders," and her secondary diagnosis was "Substance Addiction Disorders."[117] She determined that as a result of his affective disorders, the plaintiff would have mild restrictions of his activities of daily living and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace.[118] He did not have any repeated episodes of decompensation (each of extended duration).[119] Dr. Goodsby found that the medical evidence did not establish the presence of the "C" criteria for affective disorders (under listing 12.04).[120] In the "additional explanation" section, Dr. Goosby noted that the plaintiff's last use of

---

[112] AR 385.

[113] AR 384–85.

[114] AR 55–97.

[115] AR 69, 97.

[116] AR 55–61.

[117] AR 62.

[118] *Id.*

[119] *Id.*

[120] To meet the paragraph C criteria for listing 12.04, a claimant must have a "mental disorder. . . [that] is 'serious and persistent'" and there must be "evidence of both (1) Medical treatment, mental health therapy, psychological support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms or signs of your mental disorder; and (2) Marginal adjustment, that is you have a minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life." 20 C.F.R. pt. 404, supt. P., app'x 1.

methamphetamine was in 2013.[121] At a recent evaluation, the plaintiff was "noted to be generally cooperative, [he had] a dysphoric mood and mild anxiety, some suspiciousness and paranoia, but [he was] not delusional, [and had] limited insight."[122] Dr. Goosby opined that the plaintiff "appear[ed] to be at least capable of simple work in a setting with limited public and peer contact due to [symptoms]."[123] The plaintiff's alleged limits were "partially supported" by the records.[124] Dr. Goosby conducted a Mental-Residual-Functional-Capacity ("RFC") assessment. The plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, work in coordination with or in proximity to others without being distracted by them, and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.[125] He was not significantly limited in his ability to carry out very short and simple instructions, carry out detailed instructions, sustain an ordinary routine without special supervision, and make simple work-related decisions.[126] The plaintiff could sustain concentration, persistence, and pace for at least simple one- to two-step tasks for an eight-hour day and a 40-hour week.[127] The plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting, but he could adapt.[128]

K. Rudito, M.D., reviewed the medical records and opined on the plaintiff's physical impairments.[129] Dr. Rudito found that one or more of the plaintiff's medically determinable

---

[121] AR 63.

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] AR 65–66.

[126] *Id.*

[127] AR 66.

[128] AR 66–67.

[129] AR 63–69.

impairments could reasonably be expected to produce his symptoms but that the plaintiff's statements about the intensity, persistence, and functionally limiting effects of his symptoms were not substantiated by the objective medical evidence alone.[130] He found the plaintiff's statements about his symptoms (considering the total medical and non-medical evidence in the file) to be "partially credible."[131] Dr. Rudito conducted a RFC assessment and found the following limitations: the plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk (with normal breaks) for a total of six hours in an eight-hour workday and sit (with normal breaks) for a total of six hours in an eight-hour workday, and he was unlimited in his ability to push and/or pull.[132] Dr. Rudito assessed no postural, manipulative, visual, communicative, or environmental limitations.[133]

On reconsideration, the plaintiff alleged that his mental health was "worse."[134] B. Morgan, M.D., affirmed the initial physical-medical determination, and Eugene Campbell, Ph.D., affirmed the initial mental limitation determination.[135]

### 2.1.6   MDSI Physician Services — Examining

In July 2014, Dr. Deepak Shrivastava conducted a pulmonary-function test for the plaintiff.[136] The results were normal.[137]

### 2.1.7   Rose Lewis, M.D. — Examining

On April 24, 2016, Dr. Lewis completed a comprehensive internal-medical evaluation of the plaintiff.[138] She reported that the plaintiff arrived to the clinic by bicycle and was an adequate

---

[130] AR 63.

[131] AR 64.

[132] AR 64–65.

[133] *Id.*

[134] AR 95.

[135] AR 95–97.

[136] AR 290–96.

[137] AR 290.

[138] AR 399.

historian.[139] His chief complaint was shortness of breath.[140] The plaintiff told Dr. Lewis that exertion, mold, and being angry bothered his breathing.[141] He used his rescue inhaler about once a month.[142] He told Dr. Lewis that he smoked cigarettes but was trying to quit and was down to two a day.[143] He reported that he was out of breath after walking two blocks or climbing a flight of stairs.[144] He had chest pain in the past but did not receive treatment.[145] He reported that he could carry a 25-pound bag of cat food without difficulty.[146] The plaintiff told Dr. Lewis that he did all household chores and took care of his two cats.[147]

Dr. Lewis described the plaintiff as a "well-developed, well-nourished male in no acute distress who ambulates without an assistive device, sits comfortably, and can get on and off the exam table."[148] His blood pressure was elevated.[149] Dr. Lewis diagnosed the plaintiff with shortness of breath (probably cigarette related), pre-diabetes, hypertension, and hypercholesterolemia.[150]

Dr. Lewis completed a medical-source statement reflecting her observations.[151] According to Dr. Lewis, the plaintiff could continuously lift and carry up to 10 pounds, frequently lift and carry 11 to 20 pounds, occasionally lift and carry 21 to 50 pounds, and never lift or carry 51 to 100

---

[139] Id.

[140] Id.

[141] Id.

[142] Id.

[143] Id.

[144] Id.

[145] Id.

[146] Id.

[147] Id.

[148] AR 400.

[149] Id.

[150] AR 402.

[151] AR 393–403.

pounds.[152] The plaintiff could sit without interruption for two hours, stand without interruption for one hour, and walk without interruption for 30 minutes.[153] He could sit for a total of eight hours in an eight-hour work day, stand for four hours total in an eight-hour work day, and walk for four hours total in an eight-hour work day.[154] The plaintiff did not require the use of a cane.[155] He could reach, handle, finger, feel, push, and pull continuously with both hands.[156] He could continuously operate foot controls with both feet.[157] He could frequently climb stairs, ramps, ladders, and/or scaffolds and could continuously balance, stoop, kneel, crouch, and crawl.[158] He had "mild exertional dyspnea."[159] None of the plaintiff's impairments affected his hearing or vision.[160]

The plaintiff could continuously tolerate exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity and wetness, extreme cold, extreme heat, and vibrations.[161] He could occasionally tolerate dust, odors, fumes, and pulmonary irritants.[162] His pulmonary limitation was related to mold.[163]

Dr. Lewis found that the plaintiff could do the following activities: shop; travel without a companion; ambulate without using a wheelchair, walker, canes, or crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps

---

[152] AR 393. As used in the statement, "regular and continuous basis" means eight hours a day, five days a week (or an equivalent work schedule), "occasionally" means very little to 1/3 of the time, "frequently" means 1/3 to 2/3 of the time, and "continuously" means more than 2/3 of the time. AR 393.

[153] AR 394.

[154] *Id.*

[155] *Id.*

[156] AR 395

[157] *Id.*

[158] AR 396.

[159] *Id.*

[160] *Id.*

[161] AR 397.

[162] *Id.*

[163] *Id.*

at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed himself; care for his personal hygiene; and sort, handle, or use paper and files.[164]

## 2.2 Administrative Hearing (March 21, 2016)

In response to the ALJ's questions, the plaintiff testified as follows.[165] For present medications, he took Nitrostat for pain and used an inhaler for shortness of breath.[166] He did not take medication for his depression or anxiety.[167] His shortness of breath ability limited his ability to stand or walk.[168] He sometimes walked three blocks to a grocery store and then would take a nap.[169]

In response to his attorney's questions, the plaintiff testified as follows.[170] He was a custodian at the University of California for eight years and then had a falling out with his supervisor, who "had something against [him] for some reason," and his co-workers, who "were just scheming against [him] for something . . . ."[171] He physically could no longer work as a custodian because he was "deteriorating quickly."[172] He testified, "I can't breathe as well as I could, that's the main thing . . . [O]ne leg is falling asleep to where I don't have very much use of it when it does fall asleep."[173] This happened when he was sitting, walking, or standing "like all the time."[174] He had shortness of breath after walking two flights of stairs and riding his bicycle.[175]

---

[164] AR 398.

[165] *See* AR 36–46.

[166] AR 36, 37.

[167] AR 36.

[168] AR 37.

[169] *Id.*

[170] AR 38–46.

[171] AR 38.

[172] AR 40.

[173] *Id.*

[174] AR 40–41.

[175] AR 41.

He described his fear of dentists and his anxiety about police and attending the hearing.[176] He felt withdrawn when he was anxious.[177] He slept for a total of five to six hours on average (in part because he slept during the day), and he was up at least three or four times during the night.[178] For "maybe" one or two days a week, he did not leave his apartment.[179] His daily energy level was "very low."[180] He could only do one thing at a time, and it was hard for him to focus.[181]

The plaintiff had difficulty talking about his symptoms.[182] He saw a therapist, which was going well.[183] "[It] was just a little better talking to somebody about the situation that [I] had and [it] alleviated some of the things I've never spoken to anybody else[.]"[184] He hadn't spoken to therapists before.[185] He spoke with a psychiatrist once a couple of years ago, but he did not know the exact reasons why he gave it up.[186] He denied that was because of anxiety.[187]

### 2.3    Vocational Expert Testimony

VE Timothy Farrell also testified at the hearing.[188] He characterized the plaintiff's prior job as a janitor (DOT code 382.664-010, medium, SVP 3) and noted that the plaintiff performed the work at a "heavy" level.[189]

---

[176] AR 42.

[177] *Id.*

[178] AR 43.

[179] *Id.*

[180] AR 44.

[181] *Id.*

[182] *Id.*

[183] *Id.*

[184] AR 45.

[185] *Id.*

[186] AR 45–46.

[187] AR 45.

[188] AR 46–50.

[189] AR 46–47.

The plaintiff's attorney posed the first hypothetical: a person limited to carrying 10 to 20 pounds and able to stand and walk less than two hours in a workday.[190] The VE testified that such a person would not be able to perform the plaintiff's past custodian work.[191]

The attorney posed a second hypothetical: a person unable to maintain concentration, persistence, and pace for 10 to 15% of an average workday.[192] The VE testified as follows: "So, at 10% the research that's been done at 10% the consensus is someone could make that up at other times of the day . . . but, anything over 10% would be [in] excess of what . . . could be made up production[-]wise and would probably result in termination."[193]

The attorney posed a third hypothetical: an individual working at the unskilled level and having to miss multiple days of work per month.[194] Mr. Farrell testified that "anything in excess of one [day] per month would result in termination."[195]

The attorney then asked, "[I]f somebody had physical conditions that would interfered about 10% of the given workday and then they also had anxiety and depression that prevented — created additional barriers in maintaining concentration would it be preclusive? Anything beyond 10%."[196] The VE responded, "Right, that's what I'm saying, anything but — whatever the cause, whether it — psychological or physical. If you're off task more than 10%, employer feedback is that it cannot be made up in the course of a workday."[197] The attorney asked what the threshold was generally at the unskilled level for missing "around two days of work per month," and the VE said that "[t]he majority of employers contacted in an International Association of Rehabilitation

---

[190] AR 47.

[191] *Id.*

[192] *Id.*

[193] AR 47–48.

[194] AR 48.

[195] *Id.*

[196] AR 46–47.

[197] AR 48.

Professionals survey said that anything in excess of one [day missed per month] would result in termination of unskilled work."[198]

The attorney then asked whether there would be jobs for somebody who was "consistently unable to respond appropriately to supervision or criticism from supervisors due to issues with authority? Meaning they could only have superficial contact with their supervisor."[199] The VE responded that responding inappropriately to a supervisor over a period of time would result in termination.[200] The attorney asked about a person with trouble responding appropriately to changes in the work setting, and the VE responded, "some people can have the same shift in the same work indefinitely . . . then it wouldn't be a problem. If there were changes[,] it would be a problem."[201]

### 2.4    Administrative Findings

The ALJ followed the five-step sequential evaluation process to determine whether the plaintiff was disabled and concluded that he was not.[202]

At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since June 1, 2009.[203]

At step two, the ALJ found that the plaintiff had two severe impairments: respiratory impairment and affective disorders.[204] The ALJ reported the plaintiff's history of substance abuse, noting his lack of use since 2014, his apparent commitment to avoid drug use, and the state-agency medical consultant's opinion that his substance-use disorder was not a severe impairment.[205] He concluded that "[t]he record establishes the limitations assessed herein

---

[198] *Id.*

[199] AR 49.

[200] *Id.*

[201] AR 50.

[202] AR 17–26.

[203] AR 19.

[204] *Id.*

[205] AR 20.

independent of any substance use during the relevant period, and a substance use disorder is not found to be a factor material to a determination of disability in this case."[206]

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.[207]

The ALJ concluded that the plaintiff's mental impairment did not meet or medically equal the criteria of Listing Sections 12.04 (affective disorders), 12.06 (anxiety-related disorders), or any other section.[208] In making the finding, the ALJ considered whether the plaintiff satisfied the "paragraph B" criteria and found he did not.[209] Specifically, the ALJ held the following:

> I have considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.
>
> With respect to activities of daily living, the claimant has mild restriction. He reportedly requires reminders for grooming. Records reveal that the claimant reported in January 2015 that he had an apartment and was no longer homeless. When he goes out, he travels by walking and riding a bicycle. With respect to maintaining social functioning, the claimant has mild to moderate difficulties. He reportedly does not like being around people and has difficulties with authority figures. He reportedly was fired from a job at UC Berkeley because of problems getting along with others although other records indicate that he was terminated due to anger and agitation when he was questioned regarding thefts at his place of employment. The claimant also reported that he has a girlfriend with whom he spends time and he told the consultative psychologist that he was in a romantic relationship. He reported that he takes the bus on occasion. He occasionally joins a card game for fun. Regarding

---

[206] *Id.*

[207] *Id.*

[208] *Id.*

[209] The paragraph B criteria is the same for listings 12.04 and 12.06. To meet the criteria, a claimant must demonstrate an "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) Understand, remember, or apply information; (2) Interact with others; (3) Concentrate, persist, or maintain pace; (4) Adapt or manage oneself. 20 C.F.R. pt. 404, subpt. P, app'x 1.

maintaining concentration, persistence, and pace, the claimant has mild to moderate difficulties. As noted, he reportedly requires reminders for personal grooming and also to go places. He reportedly has difficulty with memory, concentration, completing tasks and following instructions well.[210]

The finding of even moderate restrictions or difficulties in general is not intended to constitute a finding of an inability to sustain at least simple, routine tasks consistent with jobs requiring a specific vocational preparation (SVP) of 3 or the limited interaction required of most such jobs with the residual functional capacity in this case.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation of extended duration.

Because the claimant's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.[211]

The ALJ also found that the plaintiff did not meet the "paragraph C" criteria of either listing 12.04 or 12.06.[212]

The ALJ then determined the plaintiff's RFC.[213] In making this finding, the ALJ considered all the plaintiff's symptoms and the extent to which they could be reasonably accepted as consistent with the objective medical evidence and other evidence.[214] The ALJ followed a two-step process.[215] First, the ALJ determined that the plaintiff's medically determinable impairments could reasonably cause the alleged symptoms. Second, the ALJ found that the intensity, persistence, and limiting effects of these symptoms, as alleged by the plaintiff, were not consistent with the medical evidence in the record.[216] The ALJ concluded that the plaintiff was able to perform jobs at least at the SVP 3 level.[217]

---

[210] AR 20–21 (internal record citations omitted).

[211] *Id.*

[212] AR 21.

[213] *See* AR 21–25.

[214] AR 21.

[215] AR 22.

[216] *Id.*

[217] AR 21. Specific Vocational Preparation ("SVP") is defined "as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for

The ALJ found that the plaintiff's respiratory impairment posed no restriction for his physical capacity for medium work.[218] The ALJ relied on the following grounds: (1) the plaintiff's last job was as a custodian, which he performed at the heavy-exertion level; (2) the plaintiff performed that job for years until he was fired for reasons unrelated to his physical conditions; (3) a pulmonary functioning test in July 2014 revealed normal spirometry; (4) his diagnoses included smoking problems, but the plaintiff continued to smoke despite recommendations by his doctors to quit; and (5) the assessment by the post-hearing examiner, Dr. Lewis, who opined that he could perform medium-level work.[219]

The ALJ recognized that the plaintiff reported shortness of breath to his treating physicians several times, but he found that it was not substantiated by the results of the pulmonary functioning testing in 2014 (which was normal), clinical findings on physical examinations (finding that it was mild), and Dr. Lewis's examination and diagnosis (where she concluded that it was "probably cigarette-related").[220] The ALJ noted that Dr. Fentress found that the plaintiff had dyspnea on exertion but was "stable."[221] The ALJ recognized that Dr. Lewis assessed limitations on the plaintiff's working around chemicals, dust, fumes, and gases that might irritate his respiratory condition, but he found that the record did not support a finding that the limitations would preclude the plaintiff's past relevant work, "consistent with the vocational expert testimony and the fact that he was able to do that job for years until he was fired for reasons unrelated to his physical condition."[222]

With regard to the plaintiff's affective disorders, the ALJ considered the claimant's report in April 2014 that he was depressed, his lack of treatment for the past eight years, his report in

_____

average performance in a specific job-worker situation." On the SVP scale, a 3 refers to any training "Over 1 month up to and including 3 months." Dictionary of Occupational Titles, App. C, 1991 WL 688702 (4th ed. 1991).

[218] AR 22–23.

[219] *See id.*

[220] AR 23, 290, 402.

[221] AR 23.

[222] *Id.*

December 2015 that he was receiving counseling, his "good spirits" at treatment in March 2016, Dr .Walser's assessment, and his difficulties at work.[223] He concluded that "the record as a whole [did] not support such severe limitations" that were suggested by Drs. Walser and Franklin.[224] He gave their opinion "little weight based on the relevant factors and the record as a whole."[225]

The ALJ then addressed the additional evidence contained in Dr. Fentress's treatment records from December 2015 to March 2016 and his assessment of the plaintiff's mental and physical ability to do work-related activities.[226] The ALJ found the following:

> Matthew Fentress, M.D., completed forms in March 2016, in which he reported that he had seen the claimant for approximately three months, from December 2015, and provided both mental [and] physical capacity assessments. He indicated that the claimant could lift twenty pounds and sit throughout a workday but that he was able to stand or walk for less than a total of two hours. He deferred assessment of other physical capabilities and provided no diagnoses or records supportive of that assessment. With respect to mental limitations, he diagnosed depression, assessed a GAF of 40, and reported that the claimant had no or mild limitations with respect to activities of daily living but marked limitations in social functioning and concentration, persistence, and pace. He assessed that unspecified physical impairments would interfere with concentration, persistence and pace 10% of the time and that the claimant would never be absent from work, but that he would be absent about two days a month due to mental impairments. As noted, he reported that he had seen the claimant for only three months, but he assessed the mental limitations from January 2011. That assessment also is found to be inconsistent with the record as a whole, including the longitudinal history and the claimant's demonstrated abilities, as discussed above. As noted, that physician had assessed the physical impairment as stable in December 2015; the claimant was using no psychotropic medication, and, even if it were assumed that he had such severe restrictions, there is no probative evidence that he was so restricted for the requisite twelve-month period. I give little weight to that assessment for the same reasons discussed herein.[227]

At step four, the ALJ concluded that the plaintiff had the RFC to perform his past relevant work as a custodian.[228]

---

[223] AR 23–24.

[224] AR 24.

[225] *Id.*

[226] AR 24–25.

[227] *Id.*

[228] AR 25.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## GOVERNING LAW

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that. . . [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be

resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

**Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986). At step five, the burden shifts to the Commissioner. *Id.*

# ANALYSIS

The plaintiff contends that the ALJ erred by (1) improperly weighing the medical evidence, (2) improperly discrediting his testimony, and (3) finding that the plaintiff could perform his past relevant work as a custodian.[229] The plaintiff seeks remand for calculation of benefits or, alternatively, for further administrative proceedings.[230] The court grants the plaintiff's motion for summary judgment and remands the case for further proceedings.

---

[229] Mot. – ECF No. 18.

[230] *Id.* at 16.

### 1. Whether the ALJ Erred by Discounting Medical-Opinion Evidence

The plaintiff contends that the ALJ failed to properly weigh the opinions of Dr. Fentress (his treating physician) and Drs. Franklin and Wasler (the examining psychologists).[231] The court remands for reconsideration of this medical evidence.

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court [also] must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish between three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ may disregard the opinion of a treating physician, whether or not controverted. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (alteration in original) (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported

---

[231] Reply – ECF No. 21 at 3–7, *see also* Mot. – ECF No. 18 at 16–22.

by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotation marks and citation omitted). "The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

An ALJ errs when he "rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for [her] conclusion." *Garrison*, 759 F.3d at 1012–13. "[F]actors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Orn*, 495 F.3d at 631. (citing 20 C.F.R. § 404.1527(d)(3)–(6)); *see also Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (an ALJ need not agree with everything contained in the medical opinion and can consider some portions less significant than others).

The doctors' opinions are contradicted by the state agency consulting physicians' opinions.[232] Thus, the ALJ was required to give specific and legitimate reasons for discounting them. *Id.* The ALJ gave little weight to Dr. Fentress's opinion regarding the plaintiff's physical limitations because he "provided no diagnoses or records supportive of [his] assessment" and his opinion of the plaintiff's mental limitations because it was "inconsistent with the record as a whole, including the longitudinal history and the claimant's demonstrated abilities . . . ."[233] The ALJ discounted Drs. Franklin and Walser's opinion because it was "contradicted by the weight of the evidence"

---

[232] *Compare* AR 55–97 (DDEs) *with* AR 277–95 (Franklin and Wasler) and 340–410 (Fentress).
[233] AR 24–25.

and "the claimant's demonstrated history of an ability to sustain employment for years belie[d]" their assessment about his difficulty with respect to authority figures.[234] He found that the "record as a whole [did] not support such severe limitations. . . and that assessment is given little weight based on the relevant factors and the record as a whole."[235]

First, "[m]erely stating that a treating physician's opinions are not supported by objective findings is insufficient." *Morganti v. Colvin,* No. C 12–03511 CRB, 2013 WL 1758784, at *6 (N.D. Cal. Apr. 24, 2013) (citing *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988) ("To say that medical opinions are not supported by sufficient objective findings. . . does not achieve the level of specificity our prior cases have required.")) To disregard a treating physician's opinion, the ALJ must provide "a thorough summary of the facts, *his interpretations thereof,* and his findings." *Id.* (emphasis in original). The ALJ did not provide the requisite specificity here.

Second, the plaintiff's ability to "sustain employment for years" is not a specific and legitimate reason for discounting Drs. Franklin and Walser's opinion because the example that the ALJ identifies — the plaintiff's employment as a custodian — ended before certain physical symptoms, including exertional dyspnea and chest pain, manifested.[236]

Finally, the plaintiff's abilities to perform activities of daily living is not a specific and legitimate reason to discount either opinion. "The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities might not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (citation omitted). The Ninth Circuit has held that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick*, 157 F.3d at 722. Thus, the plaintiffs ability to do daily activities — riding his bicycle, playing cards, and having a girlfriend — do not constitute

---

[234] AR 24.

[235] *Id.*

[236] AR 340, 399.

specific and legitimate reasons to reject either Dr. Fentress's or Dr. Franklin's opinions that the plaintiff's conditions impose limitations on his ability to work.

The court remands for reconsideration of the medical-opinion evidence in the record.

## 2. Whether the ALJ Erred by Discrediting the Plaintiff's Testimony

In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d at 1112. "First, the ALJ must determine whether [the claimant has presented] 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Vasquez*, 572 F.3d at 591). Second, if the claimant produces that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons for" rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* (internal quotation marks and citations omitted).

"Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal punctuation omitted). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014); *see, e.g.*, *Morris v. Colvin*, No. 16-CV-0674-JSC, 2016 WL 7369300, at *12 (N.D. Cal. Dec. 20, 2016).

In order to have meaningful appellate review, the ALJ must explain its reasoning and "*specifically identify* the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines the testimony." *Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102–03 (9th Cir. 2014) ("Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing.") (emphasis in original, internal quotations omitted). "That means '[g]eneral findings are insufficient.'" *Id.* at 1102 (quoting *Lester*, 81 F.3d at 834); *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) ("the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony" (citing *Bunnell v.*

*Sullivan*, 947 F.2d 341, 345–46 (9th Cir. 1991) (en banc)). Moreover, the court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010. Here, the ALJ found the following about the plaintiff's testimony:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the type of alleged symptoms; however, the claimant's statements concerning their intensity, persistence and limiting effects of these symptoms are not found consistent with the medical evidence and other evidence in the record to the extent of the residual functioning capacity finding for the reasons explained in this decision.[237]

The ALJ did not identify specifically what portions of the plaintiff's testimony were not credible or specifically identify what medical evidence and other evidence in the record undermined his testimony. This was not a specific, clear, and convincing basis for rejecting his testimony. *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014). The court remands for reconsideration of this issue too.

### 3. Whether the ALJ Erred by Finding That the Plaintiff Could do His Past Relevant Work

The plaintiff argues that the ALJ erred by finding that the plaintiff could perform his past relevant work as a custodian.[238] This finding was based on comparing the plaintiff's past relevant work as a janitor to the RFC assessed by the ALJ. The ALJ determined that the plaintiff had the residual-functional capacity "to perform medium work, as defined in 20 CFR 404.1567(c) and 416.967(c)" and was able to perform jobs "at least at the SVP 3 level."[239] The ALJ then found the following about the plaintiff's ability to do his past relevant work:

> The claimant has past relevant work as a custodian, or janitor, Dictionary of Occupational Titles (DOT) code 382.664-010, medium exertion as generally performed in the economy and performed by him as heavy work, according to the vocational expert testimony. This job constitutes past relevant work, as it satisfies the three requirements enumerated in 20 CFR 404.1560(b)(1) and 416.960(b)(1). In comparing the claimant's residual functional capacity with the physical and mental

---

[237] AR 22.

[238] Mot. – ECF No. 18 at 9.

[239] AR 21.

demands of this work, I find that the claimant is able to perform these jobs as generally performed in the economy. AS discussed, the claimant was able to successfully perform that type of work at an even greater exertional level for many years and did not stop working due to limitations imposed by his impairment, and the record does not support a finding of such significant worsening in any condition since that time as to warrant a more restrictive residual functional capacity for any twelve-month period.[240]

The ALJ's RFC determination, and therefore his determination about the plaintiff's ability to perform his past relevant work, did not include any of the limitations recommended by the physicians in the record.[241] Presumably, the ALJ did not include limitations indicated by Drs. Fentress, Franklin, and Wasler because he discounted their opinions. Regarding the pulmonary limitations assessed by state-agency consulting examiner Dr. Lewis, the ALJ wrote:

While I recognize that Dr. Lewis indicated that the claimant should avoid working around chemicals, dust, fumes, and gases that might irritate his respiratory condition, the record does not support a finding that such limitations would preclude the performance of his past relevant work, consistent with the vocational expert testimony and the fact that he was able to do that job for years until he was fired for reasons unrelated to his physical condition.[242]

As the plaintiff points out, the ALJ did not question the VE about the effect of a limitation on exposure to chemicals, dust, fumes, and gases on the plaintiff's ability to perform his past relevant work.[243] The ALJ only asked the VE to characterize the plaintiff's prior work in vocational terms.[244] The rest of the VE's testimony was based on hypotheticals posed by the plaintiff's attorney that included limitations recommended by the various physicians in the record.[245] It is unclear whether this testimony could support a finding that the plaintiff could do his past relevant work without limitations.

---

[240] AR 25.

[241] *See* AR 21–25.

[242] AR 23.

[243] *See* AR 46–47.

[244] AR 46.

[245] AR 47–50.

Additionally, the ALJ relied on the fact that the plaintiff was able to do his past relevant work "for years" and was fired "for reasons unrelated to his physical condition."[246] This is not a valid basis for concluding that the plaintiff is able to do his past relevant work presently because some of the plaintiff's physical conditions, including exertional dyspnea and chest pain, manifested in 2015, several years after he was fired from his past job.[247]

Because the court remands for reconsideration of the medical-opinion evidence, the ALJ can reconsider this issue on remand.

## CONCLUSION

The court grants the plaintiff's motion for summary judgment, denies the defendant's cross-motion for summary judgment, and remands this case for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: June 10, 2019

LAUREL BEELER
United States Magistrate Judge

United States District Court
Northern District of California

---

[246] AR 23.

[247] *See, e.g.*, AR 340, 399.